## GLIDDEN *v.* NOBLE.

## GLIDDEN *v.* BUSELL.

PATENTS; INTERFERENCES; PRIORITY OF INVENTION.

In interference proceedings involving the priority of invention of certain devices and machines for trimming and randing shoe-heels, where the testimony showed that the machine of one of the parties as constructed was incomplete and inoperative, while that of the other, although perhaps conceived later, was operative and successful, it was *held* that the one who first produced the operative machine was entitled to priority.

Patent Appeals, Nos. 14 and 15.  Submitted January 14, 1895.  Decided March 4, 1895.

HEARING on two appeals (consolidated) from decisions of the Commissioner of Patents in interference proceedings. *Affirmed.*

The FACTS are sufficiently stated in the opinion.

*Mr. James H. Lange* and *Mr. Odin B. Roberts* for the appellant.

*Mr. J. E. Maynadier* for the appellees.

Mr. Justice SHEPARD delivered the opinion of the Court:

These are appeals from the decision of the Commissioner of Patents in interference proceedings between rival claimants of priority of invention in certain devices and machines for trimming and randing shoe heels.

The real parties at interest are the same in each case, and they have been argued and submitted together upon the evidence in one of the records.

The interest of the McKay & Bigelow Heeling Machine Association is represented by the appellant, Charles W. Glidden, while that of the Union Heel Trimmer Company is represented by appellee Oscar L. Noble and appellee James H. Busell, respectively.

The following are the issues in the controversy:

"1. In a heel-trimming machine, a rotary heel-cutter, a carriage, a support for it, a rand-guard attached thereto and shaped to project over the heel-cutter, and a rotary rand-cutter carried by the said carriage, the said parts combined, whereby the position of the rand-guard with its rand-cutter and the rotary heel-cutter may be changed relatively to expose more or less of the edges of the cutter-blades as the contour of the heel to be trimmed varies." No. 14, *Glidden v. Noble.*

"1. In a heel-trimming machine, a rotary heel-cutter, a recessed rand-guard and a rotary rand-cutter having its blades projecting outwardly between the blades of the rotary heel-cutter adjacent to the rand-guard, whereby the position of the rand-guard with its rand-cutter and the rotary heel-cutter may be changed relatively to expose more or less of the acting edges of the blades of the heel-cutter as the contour of the heel being trimmed varies.

"2. In a heel-trimming machine, the combination, with a rotary heel-cutter, of a rotary rand-cutter and a rand or counter guard, both located at the end of the heel-cutter and both together made movable in substantially the line of the axis of the said heel-cutter and with relation to the

end thereof to uncover more or less of the heel cutter blades as the rear of the heel is being trimmed." No. 15, *Glidden* v. *Busell.*

The decision of the examiner of interferences in each case was in favor of Glidden. These were reversed and the issues determined in favor of Noble and Busell, respectively, by the board of examiners in chief, whose decisions were affirmed on appeal to the Commissioner in person.

For many years before the inventions claimed by the parties herein heel-trimming machines had been in use, but the randing had been done upon a separate machine. There were very many different sizes, lengths, and shapes of heels in course of manufacture. Among these the long, slanting, and deeply-cut "ogee" and "Pompadour" heels occasioned most labor and difficulty in trimming and randing. A machine that would contain in combination the trimming and randing devices, so that heels of all shapes and designs might be trimmed and randed at the same time, was one very much to be desired, and the attention of manufacturers and inventors was early directed thereto.

The best of the old trimming devices had one or more knives or cutters fastened to a revolving hub, against which the shoe-heel to be trimmed was held by the operator.

A danger to be guarded against was that of injury to the upper of the shoe by coming in contact with the cutter-knives and the rand-knife in the two operations of trimming and randing.

In a combination heel-trimmer and rand-cutter two main objects were to be accomplished :

First. The trimming-blades and the rand-knife were to revolve through or by means of the same shaft, so as not to come in collision whilst performing their separate functions.

Second. A rand-guard for the complete protection of the rand and the upper of the shoe, which, in co-operation with the rand-knife, would have an axial motion also, so as to cover or uncover more or less of each cutter blade as the

trimming should progress and the shape and varying length of the heel might demand.

In the "ogee" and "Pompadour" shapes the heel is much longer at the rear than in front, and the cut is much deeper as it progresses from the heel-seat to the top-lift or point. Consequently the operation of the cutters had to be more and more contracted as the trimming progressed, and the direction of the rand-knife, which followed the line of the rand, had also to be maintained. To the attainment of these ends the efforts of the several rival inventors were directed.

James H. Busell's application for the patent was filed December 18, 1886, and therein he says:

"The main feature of my invention consists in the combination of a rotary cutter with a rand-knife and recessed guard, the blades of the rand-knife moving between blades of the cutter, and the rand-knife and recessed guard yielding with relation to the cutter as the heel varies in height, as more fully set forth hereinbelow."

The invention is set forth in detail in the following drawings and description referring thereto:

"In the drawings, A is the main cutter for trimming the edge of the heel.

"D is the rand-knife, E the guide for the corner of the top lift, and F, the recessed rand guide or guard; for this part F performs a double function—that is, it is a guide to enter and guide by the rand (or the angle between the heel and upper-leather) and also a guard to prevent the heel-seat end of cutter A (and the rand-knife D, when used) from injuring the upper-leather of the boot or shoe.

"In the machine shown in Figs. 1 and 2 of the drawings, cutter A revolves with shaft B and has no lateral motion on that shaft. The guide E for the corner of the top-lift may revolve with shaft B, or be held stationary, as will be well understood by all skilled in the art, but must, of course, always stand close up to the side of cutter A, so that the

Fig.1.

Fig.3.

Fig.4.

Fig.2.

short wall of the guide E will be substantially flush with the cutting-edges of cutter A. (See Busell patent, No. 308,056, November 18, 1884.) The hub $f^2$ of the recessed rand-guide F is shown as mounted on a sleeve $B^2$, which loosely fits the

outer end of shaft B, so that the rand-guide F and the sleeve
B² may move laterally until they strike the head of screw
B³. This sleeve B² is splined to the shaft B, and therefore
revolves with it when the rand-knife D is used, for the rand-
knife B is made fast to sleeve B² by screws $f^2$, as it must, of
course, revolve in order to cut out the rand. The recessed
rand-guide F I have shown as a cup; but it may of course
be a segment. It is preferable in practice to make it a com-
plete cup when the rand-knife D is used with it; but when
not so used, as is the case in some kinds of heels, it may be
a small segment, as will be clear to all skilled in the art.
The heel-rest G is supported in any suitable way, too well
known to require further description.

Fig. 5.

"In Figs. 5 and 6 the cutter A is mounted on shaft B,
which is hollowed out to receive a spindle, B', carrying
rand-knife D. Spindle B' is kept in the opening in shaft B
and compelled to rotate with shaft B by means of a pin, $b'$,
passing through slot $b$ in spindle B'. The guide E is mounted
on shaft B at one end of the cutter, and the guide E, cutter
A, and rand-knife D all rotate together, the blades $d$ of the

rand-knife moving back and forth between the blades $a$ in cutter A, according to the variations in the height of the heels. The rand-knife D is clamped against a shoulder on spindle B' by means of a sleeve, B², and a screw, B³, which passes through the sleeve into the end of the spindle. On sleeve B², between the head of screw B³ and a shoulder on sleeve B², is loosely mounted my recessed rand-guide F, whose hub $f^2$ is slightly shorter than sleeve B², so that the rand-guide does not rotate with the rand-knife when the heel-trimmer is in use, as will be clear to all skilled in the art; but the rand-knife and rand-guide yield together to suit variations in the height of the heel, the recessed rand-guide receiving more or less of the heel-seat end of the cutter as the heel varies in height.

"The operation of my trimmer is as follows: The operator places the corner of the top lift in the angle of the guide E and tips the shoe so that the rand-guides, if both are used, enter between the heel and upper. The heel is held against the trimmer and upon the rest G and turned by hand to present the edge properly, and as the heel varies in height and the rand-guide and rand-knife together yield with relation to the cutter and guide E, the heel is properly trimmed. The rest G aids the workman in supporting the heel under the blows of the blades of the cutter, which revolve with great speed, commonly about six thousand revolutions per minute. The yielding of the rand-knife to and from the heel-rest G is one of the main objects of my invention, and my trimmer is the first, so far as I know, in which this important feature is found."

After reciting several different patents for heel-trimmers and disclaiming all that is shown in them, Busell makes the following claims:

"What I claim is—

"1. In combination, rotary cutter A, having blades $a$, rand-knife D, having blades $d$ projecting between the blades

*a* of cutter A, near the heel-seat end of the cutter, and recessed guard F, covering a portion of the heel-seat end of the main cutter A, guard F, and rand-knife D, yielding together with relation to cutter A as the height of the heel varies to cause the uncovered edges of the blades *a* and the position of blades *d* with relation to the heel-seat portion of the cutter A to vary as the height of the heel varies, all arranged and operating substantially as and for the purpose specified.

" 2. In combination, cutter A, top-lift guide E at the top-lift end of cutter A, rand-knife D, with its blades *d* projecting between blades *a*, near the heel-seat end of cutter A, and recessed guard F, the guard F and rand-knife D yielding together with relation to cutter A and top-lift guide E, all arranged and operating substantially as and for the purpose specified.

" 3. In combination, cutter A, top-lift guide E at top-lift end of cutter A, rand-knife D, with its blades *d* projecting between blades *a*, near the heel-seat end of cutter A, recessed guard F, and heel-rest G, the guard F and rand-knife D yielding together with relation to cutter A and top-lift guide E, all arranged and operating substantially as and for the purpose specified."

Patent was issued hereon October 9, 1888.

Charles W. Glidden's application for patent was filed June 2, 1888, and the interference between him and Busell was declared April 9, 1891.

Busell's preliminary statement claims conception of the invention about June 5, 1884 ; the making of preliminary drawings and communication of the invention to others about September 5, 1884. He states that he made no model, but embodied the invention in a machine which was completed about July 11, 1885, and operated with partial success in several shoe factories in Lynn and other places. He also claimed to have made other machines, which were tried with success but not sold. He died before his deposition

could be taken in the case, and the evidence of others is relied on to sustain his claims. His widow testified to three drawings produced, which, she says, she saw him make in September, 1884. These are treated in the record (into which they are not copied) as sufficiently plain to show forth the invention without a working machine or model. See *Webster Loom Co.* v. *Higgins*, 21 O. G. 2031; 105 U. S. 580, 594. She also said that she saw a cutter which he had in his possession in 1885, and that he took it to be tried at Lynn and Haverhill. His home was in Boston.

There were three of these Busell cutters offered in evidence, and there is some confusion as to which was first made. A brother of Busell testified to seeing two of these cutters tried at several shoe factories about July 10, 1885, and November 13, 1885. A machinist named King, in the employ of the Busell Company said that he made one of the Busell cutters (Exhibit No. 3) in June, 1885, and referred to memoranda in his books to aid his recollection. Oscar L. Noble, the party to the interference in No. 14, and who is interested in the patent to Busell, said that the cutter and the drawings were delivered to him in July, 1885, by Busell. These drawings and the devices were taken to J. E. Maynadier to make application for patent about or before September 1, 1886. Some testimony was introduced tending to show, by memoranda in the books of Leavitte, a machinist in whose shop a great deal of work was done for Busell, that his cutter could not have been made before February, 1886. A memorandum book kept by Busell was also found and introduced, which showed entries under date of May 6, 1885, and from June 22 to July 13, 1885.

The entry of May 6 reads: " Lynn with J. E. Maynadier and O. L. Noble to look at heel-trimmer at A. T. Smith."

The succeeding memoranda show simply " Lynn, Boston, Danvers," etc., with expense charges, apparently. No mention is made of trials of the cutters. Under date of April 17, 1886, occurs the following entry: " H. T. experiment on

cutter at C. H. Howard's," and under April 20, 1886, this one: "Lynn, H. T. tried the crown prince of cutters with perfect success—beats the world." There were no other entries showing experiments.

We do not think that the evidence is sufficient to overcome the positive testimony to earlier invention and reduction to practice. The memoranda show that he was at Lynn and Danvers frequently in June and July, 1885, when the brother, corroborated by the wife, says he had furnished a cutter and used it successfully. He was undoubtedly at work attempting to improve his cutter, especially in the construction and mode of fastening the blades, all of which is shown by the memoranda of the work done in the machine shop from time to time and as late as March 27, 1886, testified to by King. Oscar L. Noble also says that in 1885, not later than September, he saw Busell affix his cutter to the old-style Busell heel-trimming machine and show how it worked; and also that on another occasion Busell brought him shoes with heels and some trimmed pieces of wood to show what he had done with the machine.

It remains now to consider the steps taken by Glidden in the process of his invention.

Glidden, like Busell, had long been working at and with heel-trimming devices. In his preliminary statement filed in this interference he claims to have conceived the idea in April or May, 1885, and to have made and experimented upon a machine in the summer of that year. He also made another machine in the spring of 1886, and then made and put upon the market his new, improved and completed machine early in 1889. His application for patent was filed June 2, 1888.

Glidden testified that after his company became possessed of the King heel-trimming machine in the spring of 1885, he commenced to devise improvements thereon. After applying a guard for running in the rand-crease for the purpose of uncovering the cutters he says it occurred to him

that a rand-trimmer might be applied to said guard and rotated in connection with the cutters. Shortly after he applied the rand-cutter, connecting it for operation to the "shaft of the cutter-head with a flexible wire shaft that connected the rand-cutter with the sliding guard to a box hung on ears. The rand-knife was attached to the flexible shaft which was supported in a movable rand-carriage, the rand-guard being recessed to receive the knife close to the edge of the rand-guard, so as to enter the rand-crease and to travel off in a line with the edge of the heel-cutters, when the distance between the top-lift and the heel-seat varied in length, it being almost identical with the one now on the '86 machine, with the exception of having forged ears in place of the ones that are cast on that of the '86 rand-guard."

A few heels were trimmed on this machine; but Glidden says he found that it was not well adapted for holding the shoe to the cutter and the cutters were too large, so that the upper was likely to be damaged.

This machine was dismantled and the flexible shaft was used in what is called his "1886 machine." The combination was the same in this machine as in that of 1885; but its blades were narrower and bent into shape to give the contour of the heel, etc.

"The motions of the two machines were alike; but the 1886 machine had its rand-carriage supported on a horizontal line at right angles with the heel-cutter shaft, while the 1885 experiment had its rand-carrier and support in a vertically perpendicular line with the heel-cutter shaft."

In this "1886 machine," as admitted by Glidden, "the rand-knives had a tendency, being under a torsional strain while cutting the rands, to come in contact with the edge of the heel-cutter."

Some heels were trimmed and randed with this machine. The action of the flexible or coiled-wire shaft was not satisfactory. The motion of the rand-knives was irregular and

they would come in contact with the cutter-blades, to the injury of both. This machine was also dismantled and set aside, and labor was then bestowed upon new devices for driving the rand-cutter. Several new plans and drawings were made, among these an "Improved King Trimmer, Glidden's Gear-Driver Trimmer, Glidden's Improved Jack-Trimmer," etc.

In the gear driven machine made from this plan a gearing device was substituted for the flexible or coiled wire shaft of the 1885 and 1886 machines. This action of this new machine, made in August, 1887, is thus described by Glidden in his testimony:

"This machine has a driving shaft which has a sliding motion in its bearings or journal, and has splined to it a gear, so that the shaft can slide through the gear, which is geared to an intermediate gear, which, in its turn, is geared to a short shaft which operates the gimbal-jointed shaft, which is connected with a short shaft that is held in a box or casting which has on it a gear which operates an intermediate gear, which in its turn operates the gear on the rand-cutter shaft, to which is secured a rand-cutter which runs in a recessed rand-guard, which guard is supported on the gear-box or casting, which box has a tipping motion given to it by a lever connected at the rear end of the cutter-shaft. This lever is attached to the cutter-shaft with a box and collar with pivoted set-screws connected with the countersunk holes in the collar. This lever has a movable fulcrum. To the said lever is connected an adjustable rod or bar, which in its turn is connected to the opposite end of the gear-box and rand-carriage to which the rand-cutter and guard are attached. Operation of this cutter-head shaft, when the heel is pressed against the tread side of the top-lift and the rand-guard has entered the rand-crease, causes the cutter-shaft to move backward and moves the lever in opposite direction which gives a tipping motion to the gear-case and rand-carriage, which causes the rand-cutters and

the recessed rand-guard to move in its support and to uncover the small ends of the cutters when a heel is being trimmed and has a variable height and allows the rand-cutters to move outward and inward between the heel-cutters."

This was followed by the improved jack-trimmer, wherein the rand-shaft was also driven by similar gearing.

The gearing device was found unsatisfactory, as was a plan for pulleys and belt, which was drawn but not made or applied.

Two new devices were made early in 1888, which were called, respectively, the "Two-Link Rand-Knife Carriage" and the "Link-and-Slot Rand-Knife Carriage."

The latest device, and the one that has been adopted in the improved Glidden machine, put on the market in 1889, is what is called "Glidden's Modern Rand-Carriage."

"This machine has a two-bladed cutter-head supported on the short shaft which enters a hole in the cutter-shaft. The machine is provided with a rand-guard and rand-knife carrier. The rand-knives are secured by dovetail and clamping screws to the rand-carrier, and rotate inside a recessed rand-guard secured to the rand-carrier box by screws. The rand-knife carrier is driven by a short gimbal-jointed shaft connected to the front part of the cutter-head. The rand-carrier box is attached to the rand-carrier bed-piece by two links, a long and a short one; the back end of the short link being adjustable in a circular slot in the out-side end of the rand-carrier bed-piece. When in use it trims and rands a heel at the same time. The rand-crease around the counter of the heel of a shoe is placed on the lip of the rand-guard, and the top-lift of the heel pressed against the top-lift guard. The heel-rest is brought up and under the heel of the shoe; the shoe turned upwards and then downwards; the heel-rest being raised or lowered as the straight parts on the side of the heel are trimmed; the rand-guard operating to cover and uncover the knives correspond-ing with the variation in the height of the heel. The rand-

knife, projecting between the heel-cutters cuts out the rand at the same time that the heel is being trimmed."

A great difference between this machine and Busell's is in the rand-carriage and its adjustment, by which as the shoe-heel is tipped with relation to the axis of the cutter, to enable the back of the heel to be trimmed, the rand-guard is tipped in the same direction to prevent its lip leaving the rand-crease; and again, the gimbal-jointed shaft, which acts inside the main cutter-shaft, in connection with the nicely adjusted links of the rand-carriage, operates the rand-knife in a satisfactory manner, whilst accommodating itself to this tipping motion in the trimming process.

We have said heretofore that the weight of the evidence is on behalf of the conception of the invention by Busell in 1884 and its reduction to practice in June or July, 1885; but in the view that we have taken of Glidden's case, it becomes immaterial whether the invention of Busell was completed before April, 1886, which is the true date as contended on behalf of Glidden.

We think it clear that the machine of Glidden was inoperative and practically a failure until he adopted the device above described, which the evidence offered on his behalf shows was invented, not by him, but by Henry W. Winter, of whom more will be said hereafter.

It is true that a few shoe-heels were trimmed on the 1885 and 1886 machines and on the gear-driven trimmer and the improved jack-trimmer; but no one of them operated or would operate continuously and successfully.

It is apparent that no one of the three devices for operating the rand-knife and guard in co-operation with the cutter-blades—viz., the flexible or coiled-wire shaft, the gear-driver, or the contemplated belt—would answer the purpose at all. The heel-cutter was required to make from 5,000 to 6,000 revolutions per minute, and it was impossible for any one of those devices to communicate this motion for any reasonable time to the rand-knife and guard, leaving out of consideration the axial motion constantly required of

the latter in covering and uncovering the cutter-blades and following the conformation of any kind of heel and rand.

Notwithstanding the idea in his mind and the many attempts to give effect to it, Glidden's invention was incomplete. It lacked the final and necessary step. It would not work. A machine that will not do what it is intended to do cannot be given priority over one that is successful and operative. *Coupe et al.* v. *Royer et al.*, 70 O. G. 779, 155 U. S. 565; *Consolidated Valve Co.* v. *Crosby Valve Co.*, 30 O. G. 991, 113 U. S. 157; *Coffin* v. *Ogden*, 5 O. G. 270, 18 Wall. 120. Therefore, as between Glidden and Busell, even admitting that the latter's conception was later in time, priority should be awarded to Busell, who, working to the same end, first produced an operative machine.

This brings us to the consideration of the interference in No. 14, between Glidden and Oscar L. Noble.

Noble filed his application February 23, 1888, and the declaration of interference between him and Glidden was declared April 9, 1891, as set out in the beginning, being claim 4 in Noble's application and claim 1 in Glidden's.

Noble claims to have conceived the idea in the spring of 1886 of improving on the Busell cutter. His invention, he says, was to "show means of revolving a rand-knife in unison with cutter-blades, the rand-knife running between the cutter-blades and yielding in a line to correspond with the line of the cutting-edge of the cutter-blades to expose more or less of the cutter-blade, as the heel varies in height between the corner of the top lift and the rand-crease; it adds to the invention of Busell the diagonal movement when being withdrawn to uncover more of the cutter than is exposed when closed up to its narrowest limit."

He says his idea was "that if the rand-knife in Busell's invention (above described) was put in the invention shown in Busell's 1883 patent, and a proper means provided for revolving the rand-knife within the rand-guard, so that it should yield as shown in the 1883 patent, that it would be a substantial improvement."

He claims to have put his invention into working form in the latter part of 1887. He says that Henry W. Winter, who worked in the shop, assisted him in doing the work, and he charges Winter with carrying off parts of the model when he left the shop and services of the Union Trimmer Company and entered that of the McKay & Bigelow Company. No one besides Winter seems to have seen this model or device, according to Noble's evidence, and the only corroboration that he has is in the evidence of J. E. Maynadier, who says that some time prior to September 30, 1886, Busell and Noble called at his office. The purpose was then to prepare for the Busell application. He says:

"I had been informed by Noble that the combination of the heel-cutter with the guard and rand-knife by means of a carriage adjustable to cause the lip of the guard to yield in a direction parallel with the cutting-edge of the blade of the heel-cutter was not to be shown in those diagrams for the reason that such improvement on or modification of Busell's invention was the invention of O. L. Noble and to be covered by a patent to be applied for by him. . . . I also know that the manner of revolving the rand-knife when its axis of revolution was out of line with the axis of revolution of the heel-cutter was explained to me, and I feel pretty sure that the means explained are those shown in Noble's application now in interference."

Henry W. Winter says that he was employed in the machine shop of the Union Trimmer Company under Noble, and that while examining one of the Busell cutters he himself conceived the idea of the double-link device from a parallel rule ordinarily used by draftsmen, which a fellow workman was holding in his hand and working back and forth; that he made a drawing and then a crude machine, which he fastened to a Busell cutter and experimented with; that he made another and larger one to operate with what was called the "O. L. Noble Cutter," which was intended to be driven by means of a pin in the face of the rand-carrier, inserted in a hole made something larger than the pin, and

that this was left by him in the shop. He says that he tried to secrete his invention from Noble, but that one day in the fall of 1887 Noble came in the shop and saw this device mounted on a machine (this is called in the evidence "Exhibit Noble No. 1"); that as soon as Noble saw this he said: "Mr. Winter, you have got it," and then commenced to negotiate for its purchase; that Noble declining his proposition he sold it to the McKay & Bigelow Company and went into their employment, after having been discharged by Noble. It appears that an application for a patent was made in Winter's name October 9, 1888, and that a patent issued thereon March 3, 1891. There was some testimony introduced which tended in some degree, it may be said, to corroborate Winter's testimony as to his invention, though not necessarily incompatible with Noble's contention.

It is not necessary now to pass upon the evidence on this point and determine whether Noble or Winter be the real inventor of the link-carriage or improvements thereon. This controversy may be waged hereafter should an interference be declared between Noble and Winter, and we will intimate no opinion with respect to its merits.

It is clear that neither Winter or Noble made this invention. It has been patented to Winter, as we have seen, but evidently for the use of the McKay & Bigelow Company, the real owners of the Glidden claim also. Its patentable novelty must be assumed, therefore, as far, at least, as those parties are concerned. Glidden certainly did not invent it, and until he obtained the device through Winter, his combination of the rotary heel-cutter and the ,rand-knife and guard was inoperative and of no practical use. He is not, therefore, entitled to priority, in the matter of this interference, over Noble, whose application was first on file.

It follows from what has been said that the *decision of the Commissioner of Patents in each case (No. 14 and No. 15) must be affirmed, and the proceedings and decision of this court certified to be entered of record in the Patent Office, as required by law. It is so ordered.*